Oral argument as follows, 10 minutes for each defendant, 20 minutes for the plaintiff. Mr. McWhorter and Ms. Cobb for the defendant's appellants. Good morning, your honors.    I'm here on behalf of the plaintiff's attorney. My name is Britt Cobb, I represent the appellant Belkis Soca. May it please the court. We have raised a number of issues and some of them overlap with our co-appellant. My colleague, Mr. McWhorter, and I have coordinated a bit to try and streamline our presentation so we're not being unnecessarily duplicative of each other. With that in mind, I'd like to start with the issue that I believe is the proverbial ball game for both Soca and Sosa. And that is the issue of multiple conspiracies. And to quote Kodiakos, which I know the court is undoubtedly familiar with, the indictment charged a single conspiracy only. The proof showed more than one. The instructions told the jury erroneously that on the evidence they could find the defendants guilty of a single confederation. This was reversible error in Kodiakos, and so it is here. We have multiple conspiracies. One which involved Soca, Sosa, and the others to rip off insurance companies through two clinics called Revive and Renew. And a second conspiracy which involved the others, but not Soca and Sosa. And that was to rip off insurance companies through the use of a clinic called H&H. The facts and the proofs in this case exclude the possibility that Soca and Sosa were involved in the conspiracy to defraud through H&H. And not only is the record completely devoid of any evidence that Soca and Sosa were involved at H&H, the one person who testified at trial who could have and was in a position to implicate Soca at H&H said she had nothing to do with it. Herrera testified at trial. He said he was the owner of H&H. He said it was his. He opened it with help from his father. Soca was never in H&H. Soca never gave Herrera any money for H&H. She had nothing to do with the operation of H&H and did not receive any profits. There was not even any evidence in this considerable record that Soca knew H&H was up and running, The government wants to dilute the longstanding requirement of knowledge and agreement to participate in a common goal by saying overlap in participants, overlap in means, that's enough to create one conspiracy. But it's not. Overlapping participants, similar schemes, and similar goals are not the same as a common goal. And we know that clearly from the court's authority in Mize. And when I look at the Mize case and I look at this case, I have a very hard time finding any differences in the two. So this is almost exactly like Mize, where there was essentially what I would call a spin-off conspiracy, which despite the overlap in participants and methods, there wasn't any evidence of a common goal or agreement involving Soca. In my view, reading the Mize case, Soca is Bustle. The Mize conspiracy was inspired by the Bustle conspiracy, with overlap in almost every way except for Bustle. And the same can be said for Soca. And while it may be true that what the others were doing at H&H overlapped with what was going on at Revive and Renew in most ways, that does not turn Soca and Sosa into conspirators here. Now, having said that, the issue becomes what do we call it when there are multiple conspiracies? Is it a constructive amendment to the indictment, or is it a prejudicial variance? Constructive amendments obviously are reversible per se. The one thing about this case that is different from Mize that I believe makes us fall into the category of it being a constructive amendment is that there was no jury instruction given to cure the problem of multiple conspiracies. In Mize, there was. And my reading of Mize is that that was what was dispositive for the court to not find a constructive amendment, but to find a variance where they then had to go into the issue of prejudice. Here, we don't have a multiple conspiracy instruction. We asked for it. It wasn't given. We asked that some additional language be inserted into the standard instruction on conspiracy and the alternative to sort of focus in on the fact that the government had to prove the conspiracy charged in the indictment. And none of that was given. And because constructive amendments occur when the evidence and the jury instructions undermine the indictment, I believe that's what we have here, and that it's reversible error on count one, the conspiracy. And because of that, I believe that we are asking for a new trial on the conspiracy. And I submitted some additional authority to the court yesterday because I think what we actually will need here is a new trial on all counts. And the reason for that being that count one, the conspiracy, is made part of the rest of the substantive counts. So we have counts two through 13, which were the healthcare fraud counts. And they read, and I'm going to just read from the indictment here. The United States incorporates by reference count one, paragraphs one through 20, and over at acts one through 14 above, as if fully set forth herein as the scheme to defraud. The mail fraud counts read exactly the same way. So if count one fails as being multiplicious, the substantive counts must also fail because the scheme to defraud, which is necessary for convictions on the healthcare fraud counts and the mail fraud counts, are defined as a failed conspiracy. So we are asking that the court reverse and remand for a new trial on all counts. The other issue I wanted to take a moment to address is the two-level guideline increase under 2B1.1B15 for conscious or reckless risk of death or serious bodily injury. That was applied in this case, we believe erroneously. What it would require is that the fraudulent conduct of Soka and Sosa recklessly created a risk of serious bodily injury. Serious bodily injury is defined in the guidelines as extreme physical pain, protracted impairment of a bodily member organ or mental faculty that is likely to be permanent. This is a case where we don't have accidents at all. We have contrived situations set up to look like car accidents. The cases out of circuit where this enhancement has been applied to similar schemes to defraud based on fake car accidents involved actual accidents with unsuspecting motorists, where people would get in the car and go run into somebody that had no idea what was going on. We don't have that in this case. Everybody knew what was going on. On my right here, they did run into the suspecting people as opposed to unsuspecting people, so they hoped that it wouldn't turn out badly. Is that a fair characterization? The only incident about which there was evidence of two cars actually colliding, the evidence was that the people in one car, they drove to a location, the people got out of the car, somebody bumped into the back of it, and then they got back into the car. I'm not recalling any evidence about a situation where there were motorists going through on a street or on an intersection and hitting each other. I'm recalling bumps into guardrails, bumps into trees. In one case, one of the cars was hit with a hammer. The one you're thinking about, I'm looking, the government's brief refers to he was paid to run into the back of a car driven by Lester Hermida. Is that the one where you say they got out before the accident happened? I believe so, Your Honor. I could be wrong about that, but I believe so. Okay, we can ask them. Thank you. Okay, thank you. Good morning, Your Honor. My name is Barry McWhorter. I'm appointed counsel for Mr. Sosa. As Ms. Kava stated, we have kind of coordinated a little bit what arguments each of us to raise because of time limitations. So I would like to talk about what I consider to be the more important points for specifically Mr. Sosa. There are three sentencing issues that we have raised in our brief, one of them being the enhancement that you all just discussed. If time permits, I'll be glad to discuss that as well. The other is the enhancement for obstruction of justice and, finally, the enhancement for being a leadership or organizer. With respect to the obstruction of justice enhancement, I think it's very important for the court to consider the actual conduct involved in this. And when reviewing the transcript, as Your Honors know, I did not try this case, so I'd like Your Honors to review the transcript to determine what occurred. In reviewing the transcript, it became apparent to me that the incident that the government contends is the obstruction of justice is when Mr. Sosa's wife, the co-defendant, Mrs. Soka, went and spoke with another co-defendant, Mr. Martinez Lopez's wife, after his bond had been revoked. And during that conversation, they met on two separate occasions. The first one, Mr. Sosa was not even present. He wasn't in the house. He wasn't anywhere around. The co-defendant, Mrs. Soka, had gone and spoken with her by herself. Now, on the second time, and this is the only other meeting, when they went, Mr. Sosa was present, but he was not a participant of the conversation. He was, in fact, outside of the building where the conversation occurred. He was in the vehicle waiting. Apparently, he had brought Mrs. Soka Fernandez to that meeting, and he was waiting outside. And I believe that the district court just inferred from his mere presence that he was part of what was going on that he considered to be obstruction of justice. With all due respect, I suggest to the court that the conduct as set forth in that sentencing transcript is not sufficient for it to be obstruction of justice. When your honors review the cases that talk about obstruction of justice, you're seeing much more egregious activity. One of the examples that we've cited is a gentleman that, while incarcerated, called his wife and dictated an affidavit to her, which she then took to a confidential informant, who then signed it in front of a notary, and then presented it. And in that affidavit, it said that there had been no drug activity. Later on, he recanted at trial, but the egregious behavior there was that detailed affidavit. In most of these cases where the obstruction has been applied, I think that's the type of behavior you tend to see. You tend to see an almost strong-handed influence on how somebody is going to testify. There's no question about that, what's going on generally. Generally, they're suggesting the language to use. They're saying, hey, I need you to take this charge for me, or hey, tell them that I didn't do this. That is not what happened here. Here, during the conversation, the only thing that could be construed as trying to influence the testimony is the offer of money. And what occurred is Mrs. Soka Fernandez basically said, I know your husband's bond has been revoked. We can help financially if you need it. Now, the government contends that was an attempt to influence the witness. We suggest that there could absolutely be an innocent motive there. We think that there was an innocent motive there. These people did know each other before this case. They were trying to help one another. But if you could look at it as innocent or not, then the district court gets to make that call unless there's clear error, isn't there? That's correct, Your Honor. It is a clear error standard of review, and the district court does get to make that call. But I think upon studying this transcript, it's apparent to me that it is clear error, and I suggest that to Your Honors. And the reason why is just, and that's with respect to Mr. Sosa, because I think part of what happened is throughout the entire case, Mr. Sosa and his wife, who is a co-defendant, Mrs. Soka, were almost intertwined, but their behavior was not the same. And as Your Honors know, when you're married, you don't become one individual. Yes, there's some overlap as to activities, but people are still independent. And all of the testimony with respect to Mr. Sosa talks about, or at least the majority of it, how he's kind of removed from the process. For example, when they're talking about billing, Mrs. Soka Fernandez is actively doing the billing. Most of the witnesses testified that Mr. Sosa may have been present, but he was not involved in doing the billing. It's the same type of situation here when we're talking about the obstruction, that Mr. Sosa may have been present, but he wasn't actively involved, and he was very, very far removed. He wasn't present during the first conversation, and then during the second one, he was outside in the vehicle. With respect to the leader-organizer enhancement, it's a similar type of situation. It is a factual analysis again, so we are looking at clear error review. But again, Mr. Sosa's behavior, the facts related to Mr. Sosa seem so far removed from being a leader at that point, that the four-point enhancement seems inappropriate. We would suggest there shouldn't be any enhancement. We would concede, however, that it might be more appropriate for there to be a two-level enhancement instead of a four-level enhancement. And the reason why is some of the witness testimony does talk about Mr. Sosa being present when one of these conspiracies was being set up. He was present when they went and spoke with the doctor that was giving the prescriptions, but he wasn't present throughout a lot of the other activity. There's no allegation he was present with H&H Clinic, because there were three separate clinics involved here. There's no allegation that he was involved in the billing except for by one witness in any of the clinics. Everybody else talks about how it was either Mr. Soka Fernandez or the other co-defendants, Mr. Acuna or Mr. Martinez-Lopez. And then, your honors, with respect to the conscious or reckless risk of death enhancement, what we're dealing with here are staged accidents that, by design, nobody was supposed to be injured. You know, the testimony about one of the accidents is it didn't even occur. They took a hammer and broke out the front lights. There wasn't a collision with another car. The enhancement that, or excuse me, the accident that Mr. Sosa was involved in, the testimony was he waited until there was no other cars around. He slowly pulled off the road and then made it look like he had struck a bush or a tree. Again, what you see differently from the other cases is they seem to be carefully making sure there is no risk of injury to anybody else. And that's why we suggest the enhancement does not apply. You may proceed. May it please the court. Ron Stella on behalf of the United States. I was also the lead trial counsel below. I want to begin with the constructive amendment arguments, your honor, and I will approach the multiple conspiracies issue when I get to variances in just a moment, if the court would indulge me. The first thing that I think is absolutely clear from the record here is we do not, under any circumstance, have a constructive amendment. And I understand why the appellants argue that it's automatic reversal. I'd be arguing it too. But there has not been a case where a constructive amendment has been found unless the evidence at trial broadened what was alleged in the indictment. And I've cited the cases going back to the U.S. Supreme Court in Sterone, right through Mize, and in this circuit, that clearly indicate that you have to broaden what was alleged. Nothing in this case broadened what was alleged in the indictment. The indictment always alleged that these defendants carried out a staged automobile accident fraud scheme at three different clinics and with individuals who carried it out at all three clinics, revive, renew, and H&H. That's all we ever alleged, and that's exactly what we proved at trial. Now, one fundamental disagreement with the position of appellants is that they want this court to believe that there is not one conspiracy if they did not invest in, profit from, or set foot in H&H rehab. And that simply is not the law of the circuit. The law is, which I will discuss in a moment with variances when I get into multiple conspiracies, is that members in a conspiracy can change. They can evolve over time, and not all of them need to be involved at all moments in time. What the law also says, Your Honors, is that if the government proves a narrower conspiracy at trial than alleged in the indictment, then there is no constructive amendment. That's the Miller case and the Weinstock case. And so even under the best circumstances for the appellants, that they weren't involved in a conspiracy with H&H, which again they were, we still proved a conspiracy with revive and renew, which they have not challenged the sufficiency of the evidence for. And we proved a narrower scheme. Now turning to probably the more important issue, which is the variance. A variance exists, well first of all there would be two things they would have to prove. Material variance, and then secondly that it affected their substantial rights. So let's turn to whether they can even show a material variance. What they must prove now to this court is that the only construction, the only construction of the evidence is that there was one conspiracy, or two conspiracies and not one, I apologize. And to answer that question, this court has to look at the evidence in a light most favorable to the government. And there's just simply no way on this record that the only construction that a juror could have given was that there were multiple conspiracies and not one. This gets back now to what I said I would address, which is why there are not multiple conspiracies. The law in this circuit is that if they have the same goal, you look at the goal, you look at the scheme, you look at the participants. Each member, as I said, doesn't have to participate in every facet or stage, the membership can change. What's important is that they all agreed upon a common venture or a common goal. What did this evidence show? It showed an overarching scheme to defraud auto insurance carriers by staging accidents and sending in physical therapy forms for therapy that wasn't needed or wasn't provided. It started with Revive Therapy Clinic, it went to Renew Therapy Clinic, and then it also went to H&H Rehab. They all overlapped at various times. As Revive phased out, Renew took prominency, and while Renew was operating, H&H Rehab was operating. And most importantly, the participants here were substantially overlapping. All of those clinics, the evidence at trial showed, used the same recruiter, Ms. Rojas, the same physician, Dr. Barrero, the same participants, some of the same participants pretending to be patients. Towards the end, patients who had done fake accidents at Renew and Lansing, Michigan, were becoming patients at H&H Rehab. But most importantly, if you don't look at anything else, I would encourage the court to look at the confidential informant of the government. Her name was Ms. Sanchez. She testified as Ms. Sanchez Jimenez. She was our confidential informant. While all these clinics were operating, a confidential informant of the government was taken by the recruiter, Ms. Rojas, first and foremost. First to Mr. Herrera, who owned H&H Rehab. He looked at her paperwork. He said, it looks like you have an accident that will work. It looks like you have insurance that will work. We're going to call you back. What happened next? She didn't go with Mr. Herrera to see the doctor. He didn't start billing fraudulently. What he did is he directed her to Mr. Acuna. Mr. Acuna owned Renew. Renew was directed by Sosa and Soka. All the testimony in the record is they set up that clinic. They profited from that clinic. They were directing the massage therapist there to create fraudulent forms. Now why does that confidential informant go to H&H Rehab through the recruiter and then get sent to Renew, these appellant's clinic? Because they're all in it together. They are coordinating. At that point, Mr. Martinez, who was working first for Ms. Soka and Mr. Sosa at Revive, and Mr. Acuna, who is now managing Renew Therapy, meet together and take this person to see Dr. Barrero, the same doctor that all three clinics have used. Again, why does that happen? I think the answer is obvious. She's then told, we're going to have another meeting. She gets together in a parking lot. Who's there again? Mr. Martinez, Mr. Acuna, the people working for Soka and Sosa. They have her sign blank therapy forms. They're not for H&H, the last clinic. They're for Renew. And Renew bills until they can't get away with it any longer. And then what happens is Mr. Acuna tells that person to go back to Mr. Herrera. And Mr. Herrera bills for her until the end of the scheme. That evidence alone shows the commonality of the goal, the same scheme, the overlapping participants. Now, I will acknowledge I did not have proofs at trial that Soka and Sosa invested in H&H, just as Mr. Herrera said, and they didn't profit from it. But everything else in the record showed that it was a continuation of the scheme they agreed to start and put into place, and they were aware of it. What evidence shows that? They used the same law firm to litigate their claims when they weren't paid. Ms. Cheryl Kennedy, a paralegal, testified at trial, and Mr. Paul Whiting, an attorney out of Southfield, Michigan, testified that they represented all three of these clinics. They had to know that H&H was operating and was doing the same thing. All the same people they affiliated with for their clinics were doing the same thing at H&H. And again, the confidential informant touched all three while they were operating. So again, I just impress on the Court that at this point, they have to show the only construction is that there were more than one conspiracy, and that no reasonable juror could find that there was only one. And I simply don't think that is what the record shows. Beyond that, they have to show prejudice. We have to then look to, if this is a material variance, how are they prejudiced? And that goes to, could they defend themselves at trial? Was the trial fair? And then this idea of spillover. Did so much come in from the conspiracy they weren't a part of that they got convicted for that conspiracy? And it couldn't be any, those circumstances couldn't be any more absent. They knew all along that H&H was in this case. It was in the indictment. They moved to dismiss the indictment prior to trial, arguing that there was multiple conspiracies. They knew well and good when they walked into that trial, the government was going to say H&H was part of this. In terms of guilt transference, we had 20 substantive counts in the case, only three related to H&H rehab. We called 39 witnesses. Out of those 39, only one testified exclusively to H&H. One, the second confidential informant, who at the very end only went to H&H. Of the other 38 witnesses, 21 of them talked about H&H at some point, but that was only secondary to the fact that they were either patients at rehab or at Revive first, and Mr. Herrera would be the perfect example of that, your honors. Mr. Herrera, who owned H&H, that they want to say is not part of the conspiracy, testified at trial. Most of his testimony was about his involvement at Revive Therapy, where he was the massage therapist and was told by Appellant Soka how to do the fraud and to start filling out forms that weren't true. There was no motion to sever at any point, to sever from Mr. Sosa, or I'm sorry, from Mr. Martinez, the co-defendant in this case. And we had to prove Mr. Martinez's involvement in the crime, who was managing Revive Therapy. So all the witnesses, the 21 witnesses that testified that said anything about H&H, we had to call because they had information relevant to Mr. Martinez and to Soka and Sosa's operation of Renew and Revive. And then again, I had those numbers wrong. There were 17 who talked about H&H and others. There were 21 that just talked about Revive and Renew. That's what makes this case different from Mize, and I respectfully disagree with my opponents that Mize is directly on point here. First of all, in Mize, the most important thing, as I mentioned when I talked about constructive amendment, Mize dealt with the Bustle conspiracy. They went to trial against Mize and his conspiracy. They brought in evidence of Bustle. Bustle was not referenced in the indictment anywhere. That was never alleged. The proofs at trial were all about Bustle. Eight of the 11 witnesses that testified talked about the Bustle conspiracy and how Mr. Mize learned the conspiracy from him and then did his own conspiracy, which the indictment covered. That's not this case. As I just illustrated from the witnesses called, not even half of the evidence here was about H&H. Finally, there's not prejudice for a material variance to require reversal, Your Honor, unless there is not overwhelming evidence of each defendant's participation in the crime. And here we have overwhelming evidence. The evidence as to Ms. Soka was that she started the first clinic. She sought out the patient recruiter who recruited for all the clinics. She helped recruit the doctor. She gave instructions to the massage therapist on how to do the fraud. She did the billing. She received the profits. And maybe most importantly, she actually staged her own automobile accident with her husband, Mr. Sosa. They actually got in a car with two other people that Mr. Sosa recruited, and they drove off the road, called the cops, and claimed that they had had an auto accident, and then billed from the renewed clinic for treatment that they never got and never needed. And then on top of it for Mr. Sosa, he called an insurance company and said Ms. Soka's son was in the car and billed for him as well, and he was never in the vehicle. I don't know how the jury could convict them based on what they did supposedly at H&H if it had no connection. When staring them in the face was their own automobile accident that they staged and all their other links to the other two clinics. This case is not Kadiakos either, which Appellant Soka argues controls. That was eight defendants who got eight separate loans with one person, and the government went to trial in one conspiracy. None of the eight people were linked. That's the whole rimless wheel conspiracy theory in this court. This case is not a wheel conspiracy. These were people who overlapped at Revive, Renew, and at the H&H. And there's no question that they were linked. Turning quickly to the substantive counts of health care fraud and mail fraud, Appellant Soka argued in her brief that the government's failure to give to site aiding and abetting in the mail fraud counts was fatal. I think the law is absolutely clear that I don't have to cite it, that it is presumed to be included in every indictment. So there was no constructive amendment by failing to cite that. She argues here today now for the first time that there's case law that would indicate that if the conspiracy had problems, then the mail fraud and health care fraud counts would have to be thrown out because they incorporate the conspiracy. The case she's referring to from her supplemental authority, which I got yesterday, is United States v. Henning, and that deals with Pinkerton liability. The substantive counts in that case were based upon a Pinkerton instruction, and when the court below found that the conspiracy was a problem and threw it out after trial, the court did not consider whether that affected the substantive counts. We don't have Pinkerton here. The counts, the mail fraud, and the health care were premised upon aiding and abetting theory. And the Henning case, which she cites, if the court would look at footnote 11, says that the holding in Hennington is limited to the unique facts of the case. Other courts have held that reversal is not mandated where the court is persuaded beyond a reasonable doubt that the jury would have convicted the defendant of the substantive counts, either as aiders and abettors or as principals. So even the case upon which she relies allows for what happened here, which is they were convicted for aiding and abetting. I'll turn in my last five minutes here to the sentencing issues because the defendants have not addressed some of the other arguments made in the brief, and I'll come back to those if I have time. Both defendants received the risk of serious bodily harm enhancement, as they've argued. And Judge Boggs, I think you hit right on it. The question was for the district court, was there a risk of that occurring? And what the appellants want to ignore, and I agree with them, a lot of these accidents were single cars, people driving off into a tree or getting out and hitting a light or whatever. But what's first important for the court to understand, and as I've indicated in my brief, what they were told to do, if I was someone on the street and I was approached, what I was told is you need to get into an accident serious enough to get a police report, because if we don't get a police report, we can't bill insurance. So you can either run off the road, run into something, or run into another vehicle. That right there is enough, in my opinion. That is creating a risk of harm. I don't care if you're in a car by yourself. If you decide to go off the road into a ditch, another car could swerve to miss you and hit another one, anything could happen. But to your point, Judge Boggs, there were accidents, and I've cited them in my brief, where cars did collide. Everyone in both cars knew what was going to happen, but one in particular is Mr. Acuna and Mr. Espinoza, and it was believed that Ms. Soka's father was in that car, too. One car hit the other from behind, and when the police arrived to take the report, the car had been pushed out into the intersection. That creates a risk of harm right there of another car coming through the other way. The second accident I point the court to is Mr. Waters. Mr. Waters chose to go off the road. He went off and he went into a ditch, and he testified at trial that he hurt his back. He actually went to the ER and he got a prescription for it that night. So especially at this point, as Judge Boggs indicated, with the question being clear error, I don't think you can say the judge clearly erred here in finding those facts to support the enhancement for the reckless risk. As to the obstruction of justice, what we had here, Mr. Martinez, as I said, was a co-conspirator. He went to trial. After his arrest, Ms. Soka came to his house unannounced, and his wife, Ms. Mock Tornes, saw her coming and met her essentially at the door and said, you're not going to talk to him. His lawyer said, you can't talk to him. She persisted. She tried, but what she was ultimately told was, you're not going to see him. She said, well, give him a message. Tell him to tell the government that Mr. Acuna is in a fight with my husband, and he's making stuff up. Mr. Acuna managed Renew, and he had already been convicted and pled guilty and was cooperating, and everybody knew that. That's the first meeting. The second meeting is just a month before trial. Mr. Martinez's bond has now been revoked, and he's in jail awaiting trial. Mr. Soka and Ms. Sosa show up unannounced again at the home of Ms. Tornes. This time, Ms. Soka goes in almost unannounced or uninvited. The 16-year-old daughter lets her in, and Ms. Tornes comes out of the shower, and there's Ms. Soka. There's a discussion where she wants to give her money. And I think the court found totally appropriately that under those facts and circumstances, and given everything that he heard at trial about how knee-deep Mr. Sosa was in everything in this conspiracy, including getting the money, helping recruit the physician, doing his own staged accident, everything I've already covered, under all those facts, the only reason they could have been there that day to provide money a month before the trial to the wife of somebody else going to trial was to try to influence his testimony. And the law is absolutely clear he doesn't have to do that directly. He can be sitting in the car as he was and attempting to influence a potential witness through another person and asking his wife to deliver the message, Ms. Soka. At sentencing, did he try to argue he was only a driver, just taking her out for a spin? He exactly argued that. And the judge said, you know what, I don't mean to be trite, but you are a wheelman in a bank robbery. You knew everything that was going on in that house on these facts, can't find otherwise. I think I'm just about out of time. I guess what I'll say in summing up here is, and this relates to the multiple conspiracy issue, ultimately these defendants were not sentenced for the loss related to H&H Rehab. What happened was that although there was one conspiracy at trial because the membership over time changed and the participants overlapped, when we have to look at sentencing and look at what did they just jointly agree to undertake, the judge found that, okay, taking a step back now, understanding this is all one conspiracy, when I look at what you really should be charged for to be sentenced, I'm limiting it to those two. And that's totally what 1B1.3 says, is that when we look at sentencing loss, we don't look at the full scope of the conspiracy because conspiracies can go on and on and on and on. We have to look at what somebody agreed to. And for all those reasons, I don't think there's any doubt on this record that the government alleged one conspiracy, proved it, and they were sentenced fairly. Thank you. Thank you, Mr. Stella. Did you reserve any time for... I believe I used all my time, Your Honor. Okay. Same with you, Mr. McClure? Two minutes. Okay. Your Honor, if I may, I'd like to specifically address counsel's argument about the instruction enhancement. And he's absolutely right. We are talking about two meetings. But what I think it's important for the court to keep in mind is, with respect to that first meeting, there is no evidence whatsoever that Mr. Sosa was involved at all or that he had any knowledge of it. Nothing was presented at the sentencing hearing to suggest that he had any knowledge of that first meeting or he was involved. With respect to the second meeting, there's no evidence that he knew what was going on inside of the house or why his wife wanted to be there. Nobody disputes that he was there. Nobody disputes that he was in the vehicle. But without there being any evidence as to his knowledge as to what was transpiring, we just believe the instruction enhancement is inappropriate. Thank you. Okay. Thank you. Mr. McWhirter, I note that you have taken this case under the Criminal Justice Act. Yes, Your Honor. We certainly would like to thank you for your commitment to serving as counsel in this case. It's certainly a service to your client, but also to the system at large. We very much appreciate your willingness to take on this case. Thank you, Your Honor. I do want to thank all counsel for your arguments this morning. The case will be submitted. And with that, I thank you.